Joshua P. LINDSEY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 29A02–0902–CR–196.

Court of Appeals of Indiana.

Nov. 9, 2009.

Transfer Denied Jan. 21, 2010.

S. Neal Ziliak, Noblesville, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

In this case, we decide that the exigent circumstance of officer safety justified Officer Charles Kruse's actions in opening wider Joshua P. Lindsey's car door and visually inspecting the car's interior. Officer Kruse saw Lindsey run into a store, brandish a weapon, and leave the store heading in the direction of the car, which had its driver's side door ajar. Given these facts, it was reasonable for Officer Kruse to believe that the car may have been Lindsey's getaway car and that an accomplice, possibly also armed, may have been inside. Because the contents of the car were concealed by its tinted windows and the door was ajar, it was not unconstitutional for the officer to open the door wider and look inside. We affirm the trial court on this issue as well as those concerning jury selection and the appropriateness of Lindsey's sentence.

### Facts and Procedural History

Due to recent robberies of CVS stores in the area, Officer Kruse from the Fishers Police Department was performing surveillance outside a CVS store on 116th Street in an unmarked car on an evening in March 2008. At around 9:45 p.m., Officer Kruse saw a man dressed in black first walking, then jogging across the CVS parking lot. The man broke into a run as he approached the sidewalk just short of the store entrance. As he entered the store at a run, the man raised his arm in such a manner that led Officer Kruse to believe he was brandishing a weapon. Officer Kruse radioed other police units that he believed an armed robbery was in progress at his location, and officers soon arrived.

Inside the store, Katlin Kline was working as a cashier when the man, whom she later identified as Lindsey, ran into the store. Lindsey was wearing black pants, a black hoodie with the hood up, and a black bandana that covered part of his face. He pointed the gun at her and asked, "Where's the money," Tr. p. 378, and Kline told him it was in the office. Lindsey then pointed the gun at her back and led her to the office. He made Kline knock on the door while he stood away from view of the door's window. The store supervisor, Beverly Helm, looked out the window, saw Kline, and opened the door. Lindsey shoved Kline in and ordered the two women to open the safe and move to the floor. Kline immediately moved to the floor. Helm opened the safe and moved to the floor. Lindsey ordered them to keep quiet and to keep their faces down. Kline and Helm heard him rummaging through the safe and taking money out. When Lindsey was done, he threatened, "[I]f you get up, you die," *id.* at 387, and then he left. The entire robbery was captured on surveillance cameras.

Officers Kruse, Shawn Wynn, and Mark Elder, each in separate cars, saw Lindsey run out of the store and across the parking lot. All three officers tried to stop Lindsey, and Officers Wynn and Elder yelled, "Police, stop," *id.* at 517, 580, but Lindsey continued to run. Officer Kruse drove his car ahead of Lindsey, who was still on foot, and stopped his car in a public lot near a car that was in the general direction to which Lindsey was running. He stepped out of his car and walked to the driver's side of the other car, intending to cut off and apprehend Lindsey. When Lindsey was within six to eight feet of the car, Officer Kruse identified himself as a police officer and ordered him to stop. At that point, Lindsey turned around and ran in a different direction. Officer Kruse saw other officers arriving and jumping out of their cars to pursue Lindsey on foot. His attention was drawn to the car to which Lindsey had been running, whose driver's side door was open approximately six inches and windows were tinted such that he could not see inside. Although the windshield was not tinted, Officer Kruse was unable to see into the back seat. Recognizing that there might be an accomplice in the car and concerned for officer safety, Officer Kruse opened the door wider so that he could "clear" the car out, that is, make sure "that there was nobody laying [sic] down in the back seat or on the back floorboard or in the driver or passenger area of the car." *Id.* at 313. While looking for a possible accomplice, Officer Kruse saw an activated handheld police scanner in the center console, a holster on the front floorboard, keys in the ignition, a plastic bag, and clothing. Without ever touching anything in the car or even sticking his head inside, Officer Kruse confirmed that no one was in the car. He then walked around to the front of the car, felt the hood, and found the engine compartment was still warm.

Meanwhile, other officers were still pursuing Lindsey. Although they lost sight of him for a few seconds when he entered a partially constructed building, the officers on foot could hear him hitting wood and other items as he ran through. Officer David Seward was chasing Lindsey in his car. As he closed in on Lindsey, he stepped out of his car, pointed his handgun at Lindsey, and told him to put his hands up. Lindsey finally complied after Officer Seward repeated the order multiple times. Officer Seward then ordered Lindsey down on the ground. Again, he had to repeat himself multiple times. At that point, Officer Wynn came up behind Lindsey and used physical force to get him to the ground. He then received assistance from another officer in handcuffing Lindsey.

After Lindsey was secured, the officers found a black BB gun in his pocket and a can of pepper spray in a holster on his waist. Upon following the path of the foot chase, a K–9 officer and his dog found a white garbage bag with cash in the amount of $3698 in the building through which Lindsey had run. The license plate number and the vehicle identification number verified that Lindsey was the owner of the car. Nothing was removed from the car until a search warrant was obtained. None of the officers saw any person who bore any resemblance to Lindsey during the chase.

The State charged Lindsey with robbery as a Class B felony,[1] theft as a Class D felony,[2] criminal confinement as a Class B felony,[3] and resisting law enforcement as a

---

1. Ind.Code § 35–42–5–1(1).

2. Ind.Code § 35–43–4–2(a).

3. Ind.Code §§ 35–42–3–3(a)(*l*), (b)(2)(A).

Class A misdemeanor.[4] Based on two prior unrelated felony convictions for battery and pointing a firearm, the State also alleged that Lindsey was a habitual offender.[5] While Lindsey was incarcerated in the Hamilton County Jail, he confessed to his cellmate, Steven Grove, that he robbed CVS and provided details of the robbery and subsequent chase.

Before trial, Lindsey filed a motion to suppress all evidence discovered during the search of his car. He alleged that Officer Kruse's actions in opening the door wider and inspecting the car's interior constituted an illegal search, and thus all evidence obtained from that search should be excluded. Following a hearing, the trial court denied the motion, finding Officer Kruse's actions reasonable in light of officer safety and the minimal intrusion given that Officer Kruse did not enter or touch anything in the car.

Lindsey is black. During *voir dire,* three black men were in the jury pool: Juror # 5, Juror # 10, and Juror # 37. The State did not strike and had no reason to strike Juror # 5. *Id.* at 150–51. Instead, Lindsey moved to strike Juror # 5, a Noblesville police officer, for cause, but the trial court denied the motion. Lindsey then used a peremptory challenge to strike Juror # 5. The State used a peremptory challenge to strike Juror # 10, and Lindsey raised a *Batson* objection. The prosecutor explained that she felt no rapport with him, he had to think about his responses, he sat stone-faced and seemed uninvolved in the process, and he was using his Blackberry during *voir dire,* even when she was right in front of him. The trial court found that the State had provided a race-neutral reason for the strike and denied the *Batson* challenge.

Juror # 37 stated that his son was arrested and given a year of probation for marijuana possession after officers arrived at his son's apartment and were granted permission to search. Juror # 37 felt that the officers should not have asked to search, and although the incident did not leave a "bad taste in [his] mouth as far as police in general," *id.* at 287, he stated that the "bad taste would come from my being black," *id.* He then related his experience of being followed home by the police for four years and stated that he believed he was followed because he is black. He continued to relate another incident when he came to the aid of someone lying on the hood of a car in the middle of the road having a heart attack, and he explained that the police asked him questions about why he stopped, why he was in the area, where he lived, and treated him as if he had kidnapped the man. When asked if he could put these experiences behind him and be fair and impartial to the State, he responded, "That's one of many." *Id.* at 290. When asked the same question again, he responded, "I mean it's always in the back of your mind," *id.* at 291, and then related an incident when he was pulled over for speeding. The officer first asked what he was doing in the area and then gave him a speeding ticket, for which Juror # 37 felt there was no basis. Asked a third time if he could put these experiences behind him and be fair and impartial to the State, he responded, "And I'm being honest to you that would be hard to do, Sir." *Id.* at 292. The State challenged Juror # 37 for cause on grounds that he was biased against the State, and the trial court granted that challenge.

The jury found Lindsey guilty as charged. After Lindsey stipulated to his prior felony convictions, the trial court

---

4. Ind.Code § 35–44–3–3(a)(3).

5. Ind.Code § 35–50–2–8(a).

found him to be a habitual offender. The trial court sentenced Lindsey to twenty years for the robbery conviction, a consecutive twenty years for the criminal confinement conviction, a concurrent one year for resisting law enforcement, and thirty years for his adjudication as a habitual offender, for an aggregate sentence of seventy years.[6] Lindsey now appeals.

### Discussion and Decision

Lindsey raises four issues on appeal. First, he contends that the trial court abused its discretion in removing Juror # 37 for cause. Second, he contends that the trial court erred in denying his *Batson* challenge to the State's peremptory strike of Juror # 10. Third, he contends that the trial court erred in denying his motion to suppress evidence because the inspection of his vehicle constituted an illegal search in contravention of the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Finally, he contends that his aggregate seventy-year sentence is inappropriate.

### I.  Motion to Strike Juror for Cause

Lindsey first contends that the trial court abused its discretion in removing Juror # 37 for cause. Article 1, Section 13 of the Indiana Constitution guarantees criminal defendants the right to trial by an impartial jury. The purpose of *voir dire* is to determine whether potential jurors can render a fair and impartial verdict in accordance with the law and evidence. *Gregory v. State*, 885 N.E.2d 697, 706 (Ind. Ct.App.2008), *trans. denied.* Such examination is used to discover whether a potential juror has any opinion, belief, or bias which would affect or control his determination of the issues to be tried, providing a basis to exercise the right of challenge

either peremptory or for cause. *Id.* Whether a trial court should excuse a particular juror for cause rests within its sound discretion, and we will reverse the trial court only when its decision is illogical or arbitrary. *Fox v. State*, 717 N.E.2d 957, 961 (Ind.Ct.App.1999), *reh'g denied, trans. denied.* We afford substantial deference to trial judges regarding this decision because they see the jurors firsthand and are in a much better position to assess a juror's ability to serve without bias and reach a decision based on the law. *Id.* at 961–62.

When Juror # 37 was asked if the incident in which his son was arrested for marijuana possession left a "bad taste in [his] mouth as far as police in general," Tr. p. 287, he responded that the "bad taste would come from my being black," *id.* He relayed multiple experiences with police officers in which he felt he was treated differently because he is black. Although he was asked three times if he could set aside those experiences in order to be fair and impartial to the State, he never once said that he could. He first responded, "That's one of many." *Id.* at 290. The second time he was asked, he responded, "I mean it's always in the back of your mind," *id.* at 291, and then related another incident in which he felt he was treated unfairly by law enforcement. After being asked a third time, he responded, "And I'm being honest to you that would be hard to do, Sir." *Id.* at 292. We cannot say the trial court's decision was illogical or arbitrary, and thus, excusing Juror # 37 for cause was not an abuse of discretion.

### II.  *Batson* Challenge

Lindsey next contends that the trial court clearly erred in denying his

---

**6.**  At the sentencing hearing, the trial court vacated the theft conviction due to double jeopardy concerns. Tr. p. 1030–31.

*Batson* challenge to the State's peremptory strike of Juror #10. In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court determined that the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution forbids a prosecutor "to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89, 106 S.Ct. 1712. To determine whether a peremptory strike has been used improperly to disqualify a potential juror on the basis of race, the *Batson* Court set forth a three-step test. *Jeter v. State,* 888 N.E.2d 1257, 1263 (Ind. 2008), *cert. denied.* First, the party raising the *Batson* challenge must make a prima facie showing that the other party exercised a peremptory strike on the basis of race. *Id.* (citing *Batson,* 476 U.S. at 96, 106 S.Ct. 1712). Second, the burden then shifts to the party exercising the peremptory strike to present a race-neutral explanation for striking the juror.[7] *Id.* (citing *Batson,* 476 U.S. at 97, 106 S.Ct. 1712). As long as the explanation is facially valid and no discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. *Brown v. State,* 751 N.E.2d 664, 667–68 (Ind.2001). Finally, the trial court must then decide whether the party making the *Batson* challenge has carried its burden of proving purposeful discrimination. *Jeter,* 888 N.E.2d at 1263 (citing *Batson,* 476 U.S. at 98, 106 S.Ct. 1712). A trial court's decision concerning whether a peremptory strike is discriminatory is accorded great deference, and we will set aside the decision only if clearly erroneous. *Williams v. State,* 830 N.E.2d 107, 110 (Ind.Ct.App.2005), *trans. denied.*

■ The removal of some black jurors by peremptory strike does not, by itself, raise an inference of racial discrimination. *Hardister v. State,* 849 N.E.2d 563, 576 (Ind.2006) (citing *McCormick v. State,* 803 N.E.2d 1108, 1111 (Ind.2004)). In *Hardister,* our Supreme Court determined that where the defense had presented evidence that the State exercised five of six peremptory challenges to strike potential black jurors, but did not strike the two remaining black jurors, one of whom was struck by the defense, no prima facie case of discrimination had been established. *Id.* at 576–77. Here, the State removed Juror #37 for cause and used a peremptory strike to remove Juror #10, but did not strike Juror #5, who was struck by Lindsey. The State's removal of Juror #10 by peremptory strike is not enough to give rise to an inference of racial discrimination. Lindsey has failed to make the requisite prima facie showing that the State exercised the peremptory strike on the basis of race.

Nonetheless, the State would still have prevailed over the *Batson* challenge. *Batson's* second step requires only that the explanation given for the peremptory strike be facially race-neutral. Among the reasons for its peremptory strike, the State noted that Juror #10 sat stone-faced and seemed uninvolved in the process and that he was using his Blackberry during *voir dire,* even when the prosecutor was right in front of him. Because these reasons are facially valid and no discriminatory intent is inherent, the trial court did not err in finding them race-neutral.

Finally, we note that we review only a cold record. Lindsey is correct that "[t]here [was] no record that anyone other

---

7. The State need not wait until the defendant has made a prima facie showing but may proffer its race-neutral explanation at the time of the challenge. *See Koo v. State,* 640 N.E.2d 95, 99 (Ind.Ct.App.1994), *reh'g denied, trans. denied.*

than the deputy prosecutor observed Juror # 10 'look down and use his [Blackberry].'" Appellant's Br. p. 20. However, although we cannot observe Juror # 10's behavior and general demeanor during *voir dire* nor assess the prosecutor's credibility in proffering the race-neutral justifications, the trial court is able to observe these matters firsthand. There is no error.

### III. Admission of Evidence

Lindsey next contends that the trial court should have suppressed all evidence obtained as a result of Officer Kruse's actions in opening the car door wider and inspecting the car's interior before obtaining a warrant because that inspection constituted an illegal search in contravention of the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Although Lindsey argues on appeal that the trial court erred in denying his motion to suppress, he does so following a completed trial. The issue on appeal is therefore properly framed as whether the trial court abused its discretion by admitting the challenged evidence at trial. *Collins v. State*, 822 N.E.2d 214, 218 (Ind.Ct. App.2005), *trans. denied*. Our standard of review of a trial court's determination as to the admissibility of evidence is for an abuse of discretion. *Smith v. State*, 754 N.E.2d 502, 504 (Ind.2001). We will reverse only if a trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id.* We will not reweigh the evidence, and we consider any conflicting evidence in favor of the trial court's ruling. *Collins*, 822 N.E.2d at 218. However, we must also consider the uncontested evidence favorable to the defendant. *Id.* Although a trial court's determination of historical facts is entitled to deferential review, we employ a *de novo* standard when reviewing the trial court's ultimate determinations of reasonable suspicion and probable cause.[8] *Myers v. State*, 839 N.E.2d 1146, 1150 (Ind.2005) (citing *Ornelas v. United States*, 517 U.S. 690, 695–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

### A. Federal Constitution

Lindsey claims that Officer Kruse's actions in opening the car door wider and inspecting the car's interior before obtaining a warrant violated his Fourth Amendment rights under the United States Constitution.[9] The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, protects citizens against unreasonable search and seizure. *Taylor v. State*, 842 N.E.2d 327, 330 (Ind.2006). A search arises when a government actor intrudes upon an area in which a person maintains a reasonable expectation of privacy. *Holder v. State*, 847 N.E.2d 930, 935 (Ind.2006). To trigger Fourth Amendment protections, we must determine: (1) whether a person has exhibited an actual expectation of privacy and (2) whether that expectation is reason-

---

**8.** The United States Supreme Court has differentiated between the determination of the events leading up to a search, which it terms historical facts, and the determination of reasonable suspicion and probable cause, which is a mixed question of law and fact. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

**9.** The Fourth Amendment of the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

able. *Id.* at 935–36 (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). A search warrant is a prerequisite to a constitutionally proper search and seizure, and where there has been a warrantless search, the State bears the burden of proving an exception to the warrant requirement. *Halsema v. State*, 823 N.E.2d 668, 676 (Ind.2005).

▮▮▮ Assuming without deciding that Officer Kruse's actions in opening the car door wider and inspecting the car's interior constituted a search, we must determine whether an exception to the warrant requirement exists.[10] One such exception is where exigent circumstances " 'make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.' " *Holder*, 847 N.E.2d at 936–37 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). Threats to the safety of police officers and others are among the exigencies that may properly excuse the warrant requirement. *Id.* at 937 (citing *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990)). However, a search extending beyond the exigencies presented violates the Fourth Amendment. *Bryant v. State*, 660 N.E.2d 290, 301 (Ind. 1995). Although exigent circumstances justify dispensing with a search warrant, they do not eliminate the need for probable cause. *Cudworth v. State*, 818 N.E.2d 133, 140 (Ind.Ct.App.2004), *trans. denied.* In the context of exigent circumstances, the probable cause element may be satis-

fied where an officer reasonably believes a person is in danger. *See id.* at 140–41.

Officer Kruse saw Lindsey run into CVS, brandish a weapon, and then run out of the store shortly thereafter. During pursuit of Lindsey, Officer Kruse took up a position next to an unknown vehicle, and as Lindsey came within six to eight feet of the vehicle, Officer Kruse identified himself and ordered him to stop. Lindsey then turned around and ran in a different direction. Officer Kruse noted that Lindsey had been running in the direction of the car, the car's driver's side door was open approximately six inches, and the windows were tinted such that he could not see inside. Concerned for officer safety, Officer Kruse opened the door wider in order to determine whether an accomplice was in the car. In light of the fact that Officer Kruse saw Lindsey brandishing a weapon in CVS and then saw Lindsey running toward a car that had its door open, it was not unreasonable for Officer Kruse to believe that the car was Lindsey's getaway car and that an accomplice, possibly also armed, would be inside. We note also that Officer Kruse ceased his search as soon as the exigency had dissipated, that is, as soon as he confirmed that no one was in the car and thus had no reason to believe that safety was a concern. Nothing in the car was seized until a search warrant was obtained. We conclude that the exigent circumstance of officer safety was present here to justify a warrantless search.

An Eighth Circuit case on similar facts reaches the same conclusion. In *United*

---

10. Neither Lindsey nor the State argues that Officer Kruse's actions do not constitute a search. The State's brief states, "Arguably, this was not even a search," Appellee's Br. p. 19, but includes no further discussion on the point. Any such argument is thus waived for failure to present a cogent argument. *See* Ind. Appellate Rule 46(A)(8)(a) ("The argu-

ment must contain the contentions of the appellant on the issues presented, supported by cogent reasoning."); *Lyles v. State*, 834 N.E.2d 1035, 1050 (Ind.Ct.App.2005) (holding that failure to develop a cogent argument waives the issue for appellate review), *reh'g denied, trans. denied.*

*States v. Jones*, officers acting pursuant to a warrant to search for drugs and firearms at Jones' residence observed Jones and two other individuals standing by a car in front of the residence. 471 F.3d 868, 870 (8th Cir.2006), *cert. denied.* When the officers ordered Jones and the other two individuals to turn and show their hands, Jones instead made motions that led the officers to believe that he engaged in a drug transaction with a person in the car. *Id.* The side and rear windows were heavily tinted, and although the windshield was clear, the tall split-bench front seat obscured any clear view of the backseat. *Id.* at 870–71. Because the officers believed that an armed individual could potentially be concealed in the backseat, the officers conducted a protective sweep of the car. *Id.* at 871. Jones moved to suppress all evidence obtained from the warrantless search and the subsequent search pursuant to a warrant in part on grounds that the protective sweep of the car was unlawful. *Id.* Given that the officers were lawfully in the presence of the car and that a prudent officer could reasonably anticipate a dangerous individual in the car, the Eighth Circuit concluded that the protective sweep was reasonably necessary for officer safety. *Id.* 874–75; *see also United States v. Thomas*, 249 F.3d 725, 730 (8th Cir.2001) (holding that the protective sweep of a van was lawful where officers stopped the van on reasonable suspicion that the driver had just committed an armed bank robbery and officers could not see inside the van to determine whether other occupants posed a danger to them); 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.4(i) (4th ed. Supp.2008) ("[I]t has

sometimes been recognized that … protective sweeps are permissible incident to police activities other than arrests and as to places other than buildings. When lawful police activities are being conducted in the immediate proximity of a vehicle which, by its nature, does not permit ready viewing from the outside of any occupants, there may be a basis to conduct a 'protective sweep' of that vehicle."). The facts in the instant case are analogous, and we see no reason to depart from the Eighth Circuit's conclusion.

Finally, the touchstone of Fourth Amendment analysis is reasonableness, which depends on a balance between the public interest and the individual's right to be free from government intrusion. *Lockett v. State*, 747 N.E.2d 539, 542 (Ind.2001) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)), *reh'g denied.* Officer safety is a "legitimate and weighty" interest justifying an intrusion. *Id.* (citing *Mimms*, 434 U.S. at 110, 98 S.Ct. 330). Officer Kruse merely opened wider a door that was already ajar to look inside the car based on a reasonable belief that an armed accomplice might be inside. Any expectation of privacy Lindsey had in his car was surely reduced when he parked his car in a public lot with the door ajar and the key in the ignition. On balance, Officer Kruse's actions were reasonable and thus not in violation of the Fourth Amendment.

## B. Indiana Constitution

▬▬ Lindsey also claims that the search of his car violated his rights under Article 1, Section 11 of the Indiana Constitution.[11] The language of this provision tracks the Fourth Amendment almost ver-

---

11. Article 1, Section 11 of the Indiana Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

batim; however, Indiana has explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure. *Litchfield v. State,* 824 N.E.2d 356, 359 (Ind.2005). Instead, the legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Id.* Among the totality of the circumstances to be considered when determining whether a search is reasonable under the Indiana Constitution include: (1) the degree of concern, suspicion, or knowledge that a violation of law has occurred; (2) the degree of intrusion that the method of search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.* at 361. This provision is construed liberally to guarantee the people against unreasonable search and seizure. *Cheatham v. State,* 819 N.E.2d 71, 76 (Ind.Ct.App.2004) (citing *Brown v. State,* 653 N.E.2d 77, 79 (Ind.1995)).

Officer Kruse saw Lindsey brandish a weapon in CVS, run out shortly thereafter, and attempt to evade police capture. He therefore had a high degree of suspicion that Lindsey had just violated the law. The degree of intrusion that Officer Kruse's search imposed was minimal given that he merely opened wider a car door that was already ajar and never entered or touched anything in the car. Officer Kruse performed the search based on the important law enforcement need of officer safety. Upon review of the totality of the circumstances, we find that the search of Lindsey's car was reasonable under Article 1, Section 11 of the Indiana Constitution. As such, the evidence obtained as a result of that search was admissible, and we find no abuse of discretion.

## IV. Appropriateness of the Sentence

Lindsey finally contends that his aggregate seventy-year sentence is inap-

propriate. Although a trial court may have acted within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of sentences through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Reid v. State,* 876 N.E.2d 1114, 1116 (Ind.2007) (citing *Anglemyer v. State,* 868 N.E.2d 482, 491 (Ind.2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind.2007)). The defendant has the burden of persuading us that his sentence is inappropriate. *Id.* (citing *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006)).

As to the nature of the offense, Lindsey robbed a store at gunpoint. He ordered two store employees to the ground and ordered them to keep quiet and to keep their faces down. When he was done taking money out of the safe, he threatened, "[I]f you get up, you die," Tr. p. 387, and then left. Although Lindsey argues that his sentence is inappropriate since "there was no real gun used or physical injury that occurred," Appellant's Br. p. 27, we decline to take into account the manner in which the instant facts could be worse. *See Brown v. State,* 760 N.E.2d 243, 247 (Ind.Ct.App.2002), *trans. denied.* Instead, we focus on the nature, extent, and depravity of the offenses for which Lindsey is being sentenced. *See id.* Here, the store employees had no reason to believe that the BB gun was not a real gun, and they were placed in fear based on the assumption that it was a real gun.

As to the character of the offender, Lindsey's criminal record alone justifies the sentence imposed by the trial court. The Pre–Sentence Investigation Report

reflects that Lindsey has a history of delinquent and criminal activity. As a juvenile, in Washington, Lindsey was adjudicated a delinquent for such crimes as the rape of a child, theft, and assault. In Indiana, Lindsey has felony convictions for possession of marijuana, three counts of pointing a firearm, carrying a handgun without a license, and battery. He also has misdemeanor convictions for carrying a handgun without a license and resisting law enforcement. His probation has been revoked twice, and he was still on probation for the felony battery when he committed the instant offense. Lindsey's criminal history also reveals that he has been charged with such crimes as robbery, attempted robbery, conspiracy to commit robbery, and criminal confinement, though none of these charges were reduced to conviction. Even since his incarceration for the present offense, jail incident reports indicate that Lindsey smeared feces in the cell block, threatened a fellow inmate, and threatened a nurse who refused to give him Tylenol that he was going to "rip [her] face off." PSI p. 46. Finally, prior to the originally-scheduled sentencing hearing, Lindsey was involved in an "altercation." Appellant's App. p. 175. The Chronological Case Summary specifies the following:

> That as the Defendant was being transported from the holding cell to enter the Court room he attacked the Security Guard. The Court Bailiff and a Probation Officer also entered the holding cell. The Security Officer's weapon was discharged. Other Security Officer's [sic] entered the holding cell and subdued the Defendant. The Defendant's later statements indicated that his intent was to kill the Judge, Prosecutor, Public Defender and Lead Detective.

*Id.* at 7–8. In conclusion, Lindsey has failed to persuade us that his aggregate seventy-year sentence is inappropriate in light of his character and the nature of his offense.

Affirmed.

BAILEY, J., and BRADFORD, J., concur.