## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 07 2019, 5:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark D. Altenhof
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Pink A. Robinson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | October 7, 2019 <br><br> Court of Appeals Case No. 18A-CR-2218 <br><br> Appeal from the Elkhart Circuit Court <br><br> The Honorable Michael A. Christofeno, Judge <br><br> Trial Court Cause No. 20C01-1609-F3-45 |

**Friedlander, Senior Judge.**

[1] Pink A. Robinson appeals his three convictions of robbery with a deadly weapon, all Level 3 felonies.[1] He also appeals his aggregate sentence of forty-eight years, with three years suspended. We affirm.

[2] Kristina Wortinger was an assistant manager at a women's clothing store in Elkhart, Indiana. On January 9, 2016, at 8:30 p.m., she was at work, along with Reta Holley, a sales associate. A customer, Angela Heitzman, was also present. The sun had set, and it was raining.

[3] Two men entered the store through the front door just as Heitzman had finished paying Holley for a purchase. One of the men wore a hooded jacket with the hood up and was carrying a bag bearing the store's logo. Wortinger greeted him, thinking he was returning a purchase. Next, Wortinger noticed the second man was wearing a bandana over his face, leaving only his eyes visible. At that point, the man in the hooded jacket walked around the counter and pointed a handgun at her. The man in the bandana approached Heitzman and pointed a handgun at her. The men yelled at all three women, ordering them to go to the dressing room.

[4] Once they were all in the dressing room, the men asked which of them was the manager and had keys. Wortinger admitted she was the manager, and the man in the hooded jacket ordered her to come with him. As she complied, she

---

[1] Ind. Code § 35-42-5-1 (2014).

noticed he was wearing black gloves, and the man in the bandana was wearing blue latex gloves.

[5] Wortinger and the man went to the safe, which was near the cash register. It appeared to her that the man already knew where the safe was located. Wortinger unlocked the safe, but it was empty. Next, the man ordered her to open the cash registers. He took money from the registers and ordered Wortinger to return to the dressing room.

[6] While Wortinger and the man in the hooded jacket were gone, the man in the bandana had remained in the dressing room with Holley and Heitzman. In a loud voice, he ordered them to undress down to their underwear as he continued to point a handgun at them. They complied. The man in the bandana also ordered Heitzman to give him her purse. She handed the purse to him, but as she did so she attempted to dump it out, and some of the contents fell on the floor. The man took the purse, which Heitzman later learned still contained her wallet and car keys.

[7] When Wortinger and the man in the hooded jacket returned to the dressing room, she noticed that a third man was present and was accompanying the two gunmen. The men told her to deactivate the alarm on the store's back door. Wortinger initially lied, saying she did not know how to turn it off. Two of the men pointed their guns at her face, and told her they knew she could deactivate the alarm.

Wortinger, who was thinking of her daughter back home, turned off the back door alarm. One of the men initially wanted to order the women to go with them, but after a brief discussion they instead ordered the women to lie on the ground for ten minutes. The men left, taking Holley and Heitzman's clothes with them. After the men left, Wortinger called 911 to report the robbery and locked the doors. She was terrified and crying. Holley and Heitzman began to put on clothes they found in the store.

Corporal Dustin Young of the Elkhart Police Department ("EPD") was dispatched to the store along with other officers, and he arrived within a few minutes of Wortinger's call. He knocked on the front door, and Wortinger unlocked it and let him in. She appeared to be very frightened and wanted to lock the door behind the officer, even after he explained more officers were on the way. Corporal Young also saw Holley and Heitzman putting on clothes.

Wortinger continued to cry and had difficulty communicating, but she managed to describe the three robbers' clothes for Corporal Young. She also told Corporal Young she was terrified and had thought that she was going to die.

Next, Officer Kacy Weaver (who subsequently married and changed her name to Kacy Weaver Denesuk) arrived at the store. She had been trained in collecting evidence and took photographs throughout the store. Officer Weaver noted that the cash register area had been ransacked. When she entered the

dressing room area, she photographed items that were scattered on the floor, which Heitzman later identified as having been in her purse.

[12] Another officer arrived with a K9 unit and searched behind the store. He found a boot near two blue latex gloves on the ground and contacted Officer Weaver. She also found a dollar bill on the ground a little further away. Officer Weaver photographed and collected the boot, gloves, and dollar bill. Holley later identified the boot as hers.

[13] The blue latex gloves were sent to a state laboratory for DNA testing. An analyst generated a DNA profile from one of the gloves and uploaded the profile into Indiana's DNA database. The analyst learned that the DNA profile matched Robinson's already-existing profile in the database. The EPD then obtained a search warrant for a DNA sample from Robinson, collected the sample, and submitted it to the laboratory for further testing. The analyst developed a DNA profile from Robinson's sample and compared it with the DNA profile derived from the blue latex glove. The profiles were consistent and estimated to occur once in more than eight trillion unrelated individuals.

[14] After the robbery, Holley continued to work at the store, but she works only during daylight hours and is scared of male customers. When a male customer enters the store, she hides in the bathroom until they leave. Heitzman did not go back to the store for four months.

[15] On September 21, 2016, the State charged Robinson with three counts of robbery while armed with a deadly weapon, all Level 3 felonies. The case was

tried by jury, and the jury determined Robinson was guilty as charged. The trial court sentenced Robinson to an aggregate sentence of forty-eight years, with three years suspended to probation. This appeal followed.

[16]   Robinson raises five issues, which we consolidate and restate as:

1.   Whether the trial court erred in granting the State's challenge for cause of a potential juror.

2.   Whether the trial court erred in allowing a witness to testify about fingerprint evidence.

3.   Whether the evidence is sufficient to sustain Robinson's convictions.

4.   Whether Robinson's sentence is inappropriate in light of the nature of the offense and the character of the offender.

## 1. Jury Selection – Challenge for Cause

[17]   Robinson argues the trial court erred in granting the State's challenge for cause of potential juror 1869. "An impartial jury is the cornerstone of a fair trial, guaranteed by the Sixth Amendment and Article 1, Section 13 of our Indiana Constitution." *Ramirez v. State*, 7 N.E.3d 933, 936 (Ind. 2014). The purpose of the jury selection process is to determine whether potential jurors can render a fair and impartial verdict in accordance with the law and evidence. *Lindsey v. State*, 916 N.E.2d 230 (Ind. Ct. App. 2009), *trans. denied*.

[18]   Parties and trial courts achieve an impartial jury by removing potential jurors who cannot render a fair and impartial verdict. *Oswalt v. State*, 19 N.E.3d 241 (Ind. 2014). Parties may seek to remove a potential juror using two processes:

a challenge for cause; or a peremptory challenge. *See id.* at 246 (discussing the two processes).

[19] This case concerns a challenge for cause. A motion to exclude a potential juror for cause may be granted when a potential juror's views would prevent or substantially impair the performance of a juror's duties in accordance with the court's instructions or the juror's oath. *Id.* (quotation omitted). Indiana Code section 35-37-1-5 (1989) and Indiana Jury Rule 17 "list many additional bases for removing a prospective juror for cause." *Oswalt*, 19 N.E.3d at 246. For example, Indiana Code section 35-37-1-5 states that a potential juror may be challenged for cause if, among other grounds, "the person is biased or prejudiced for or against the defendant." In addition, Indiana Jury Rule 17 provides in relevant part that a "court shall sustain a challenge for cause if the prospective juror: . . . is biased or prejudiced for or against a party to the case."

[20] Whether a trial court should excuse a particular juror for cause rests within its sound discretion, and we will reverse the trial court only when its decision is illogical or arbitrary. *Lindsey*, 916 N.E.2d 230. We afford substantial deference to trial judges regarding this decision because they see potential jurors firsthand and are in a much better position to assess whether they can serve without bias and reach a decision based on the law. *Id.*

[21] In *Byers v. State*, 709 N.E.2d 1024 (Ind. 1999), the trial court granted the State's request to exclude a potential juror for cause. The juror had previously been represented by Byers' trial counsel in a criminal case and stated that he had

been treated unfairly by police. The potential juror further agreed that serving as a juror might present a problem, and if he were the defendant, having a person like him on the jury would be "a plus." *Id.* at 1026. A panel of this Court affirmed the trial court's decision, concluding the potential juror's prior representation by Byers' counsel, plus the potential juror's belief that he had been treated unfairly by police, suggested he could not be impartial.

[22] In Robinson's case, prospective jurors filled out questionnaires, which were provided to the parties prior to jury selection. During jury selection, the prosecutor asked potential juror 1869, a woman,[2] about her questionnaire, and the following exchange occurred:

> Q:    1869, you had made a comment on your questionnaire about, um, that you're a victim of the unfairness of the country's judicial system. So, obviously, that was a red flag for me. Let's talk about that a little bit. Do you remember writing that?
>
> A:    Yes.
>
> Q:    Okay. Now, while I'm curious and I want to know, because I'm a fix it kind of person, I know that that's not where we're supposed to be right now. So, I want to – I need to ask you this question. Do you feel like the judicial system is flawed?
>
> A:    It's two-fold.
>
> Q:    Okay. Tell me two-fold.

---

[2] The potential juror's race is unspecified in the record. The trial court noted: "[t]he Court does not know whether Juror 1869 is, in fact, an African-American woman. I would say this, it is the Court's perspective that she certainly appeared to be an African-American woman, or at least she appeared not to be a Caucasian woman." Tr. Vol. II, p. 67.

A:      Yes, but I don't think it's my responsibility here today, nor am I capable here today, to fix it.

Q:      Okay.  That makes sense to me.  I understand that. So, is that the twofold part of it?

A:      Yes.

Q:      So, why -

A:      Yes, I think it's flawed, but it is not my responsibility for what you called me here for to fix it.

Q:      Okay.

A:      Nor can I do that here today for what I've been called to do.

Q:      Okay.  You also talk about not judging people and not being a busy body in other people's business.

A:      Yes.

Q:      What do you mean by that?

A:      That it is not for me to judge people one way or the other.

Q:      Okay.

A:      And that I have to be about the business of making sure that I do what I have to do to be a productive member of society and just try to make the world better from what I can do.

Q:      Okay.

A:      For whatever task that I am put to do in that moment.

Q:      Do you think this process is about judging people?

A:      No.

Q:      Okay, what is it about?

A:      Law breakers and bringing them to justice.  Bringing justice to people that's been wronged.

Q:      So, if someone – if someone has broken the law, do you believe they need to be held accountable for it?

A:      Yes.

* * * *

Q:      . . . . Now, a long time ago.

A:      Yes.

Q:      A long time ago, you had some issues, correct?

A:      Yes.

Q:      Let's see.  Young and dumb?

A:      Yeah, yeah, yes, young and dumb.

Q:      Okay.  Anything about that experience that left a bad taste in your mouth?

A:      No.

Q:      Did you – how did it turn out?

A:      I served time in the penitentiary.

Q:      Did you think it was fair?

A:      Yes.

Q:      Okay.  Did you learn from it?

A:      Yes.

Q:      Okay.  And you had a member of your immediate family that's had something to do with the system.  Anything about that?  Were they treated fairly?

A:      Yes.

Q:      Okay. All right.  Thank you.

Tr. Vol. II, pp. 36-41.

[23]     Robinson then questioned potential jurors.  He had the following exchange

with potential juror 1869:

> Q:     You had made some statements on your juror
> questionnaire previously.  Um, were you talking, when you
> wrote your juror questionnaire, were you talking about the
> system as a whole, as opposed to a particular instance?
>
> A:     It's been so long since I wrote that statement, but, um, can
> you read it?
>
> Q:     Sure.
>
> A:     I'm pretty sure.
>
> Q:     You discussed being a victim of unfairness of the judicial
> system.
>
> A:     Yes.
>
> Q:     And were you talking about the judicial system as a
> whole?
>
> A:     No, I was just talking about the incident that had
> something to do with me at that time.
>
> Q:     Okay. So, are you able to put what happened to you at
> that particular time aside and be a juror on this case and rule
> fairly and impartially?
>
> A:     Yes, I could.

*Id.* at 60-61.

[24]     After Robinson finished his questions, a sidebar was held off the record.  The

trial court then excused several jurors, including potential juror 1869.  After the

jury was selected and excused for the day, the trial court held a hearing on the

record.  Robinson objected to the State challenging potential juror 1869 for

cause.  He argued that the potential juror had "clarified her responses" to her

questionnaire and would be fair. *Id.* at 64. In response, the State contended that the contradiction between the potential juror's statements in her questionnaire and her statements in court indicated that she may have "an agenda" or may have been "trying to avoid being called as a juror when she filled out her questionnaire." *Id.* at 65-66. The trial court issued the following ruling:

> I believe [the prosecutor] accurately read the statements from the perspective [sic] Juror 1869's questionnaire, which that is good because the Court wanted that as part of the record. Now, what the Court notes, and this goes to questioning by both the State of Indiana and the Defense, and it directly is related to the Court's decision to allow Juror 1869 to be struck for cause. Juror 1869's responses were inconsistent with the responses she gave on her questionnaire. But just as importantly, her responses to the State and her responses to the Defense, to questioning during voir dire, was [sic] also inconsistent. And this is the response that was the most troubling to the Court, and I cer -- I'm not arguing with you, [Robinson], I – I heard what you said and I certainly acknowledge your argument and what you said and I thought you stated that accurately but the – but the – the statement that prospective Juror 1869 made was to a question by [Robinson] and her response was that she was a victim of unfair judicial system to her, which means, it's very personal to her, which is that exactly what she expressed on her jury questionnaire.
>
> From the Court's perspective, I think when you look at the totality of that, there is no question but what prospective Juror 1869 should have been released for cause.

*Id.* 67-68.

[25]     We agree with the trial court that potential juror 1869's statements in her questionnaire sharply contradicted her statements during the hearing. In the questionnaire, she described a prior interaction with the legal system in strongly

negative terms, stating that she, like the potential juror in *Byers*, had been a victim of the country's legal system. By contrast, during the hearing, although the potential juror agreed with Robinson that her belief that the justice system was unfair resulted from her prior criminal case, she also told the prosecutor that the prior case did not leave a bad taste in her mouth, and she had been treated fairly. The trial judge was in the best position to assess potential juror 1869's credibility in light of these contradictory statements and could have reasonably determined that she could not be impartial. The trial court did not abuse its discretion. *See Byers*, 709 N.E.2d 1024 (potential juror's statement that he "had not been treated fairly by the police" was grounds for a challenge for cause).

[26] On a related topic, Robinson argues that excusing proposed juror 1869 from service violated the United States Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed.2d 69 (1986), which held that racial discrimination in jury selection violates the Equal Protection Clause. *Batson* is procedurally distinguishable from the current case because *Batson* addressed racial discrimination in the context of peremptory challenges, not challenges for cause, during jury selection. *See, e.g.*, *State v. Bowers*, 482 N.W.2d 774, 776 (Minn. Sup. Ct. 1992) ("To our knowledge, however, neither [the United States Supreme Court] nor any state court has expanded *Batson* to challenges for cause").

[27] This is not to say that racial discrimination is permissible in the context of challenges for cause. Rather, "if a prosecutor has demonstrated a challenge for

cause is necessary," then the prosecutor has presented a racially neutral explanation for removing the juror, thus meeting the standard set forth in *Batson*. *Bowers*, 482 N.W.2d at 776. In the current case, the prosecutor questioned potential juror 1869's impartiality due to the strong contradictions between her questionnaire and her answers at trial. Further, the prosecutor did not challenge for cause another potential juror of color. We conclude Robinson has failed to demonstrate reversible error.

## 2. Admission of Fingerprint Evidence

[28]    Robinson claims the trial court erred in admitting testimony about fingerprint analysis from Sergeant Denise Houser, claiming she was not qualified as an expert. The State argues that Robinson waived this claim for failure to timely object and for failure to state the reason for the objection. Based on our review of the transcript, we disagree with the State and address the merits of Robinson's claim.

[29]    Indiana Evidence Rule 702 provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

[30] Absent an abuse of discretion, we will not disturb a trial court's determination that a witness is qualified to testify as an expert and render an expert opinion. *Ross v. State*, 665 N.E.2d 599 (Ind. Ct. App. 1996). An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

[31] During Robinson's trial, Sergeant Houser explained that she is in charge of the EPD's crime scene unit and evidence facility. She has bachelor's degrees in criminal justice and psychology, and she graduated from the Indiana Law Enforcement Academy. She was an evidence technician for three years, reporting to crime scenes to collect evidence including fingerprints and DNA swabs. In 2010, Sergeant Houser was promoted to an evidence technician with the EPD's Criminal Investigations Division, which required more advanced training. During her employment with the EPD she has regularly attended additional training courses on topics including crime scene processing and discovering latent fingerprints on skin. In addition, Sergeant Houser supervises and trains the EPD's evidence technicians.

[32] Robinson objected to Sergeant Houser explaining how fingerprints are generated, identifying the processes that evidence technicians use to detect and preserve fingerprints, and describing the circumstances under which EPD evidence technicians would or would not search for prints. We conclude from the preceding paragraph that the State set forth sufficient evidence from which the trial court could conclude that Sergeant Houser qualified as an expert

witness on fingerprint evidence. The court did not abuse its discretion. *See Ross*, 665 N.E.2d 599 (no abuse of discretion in qualifying witness as DNA expert; witness testified about his education and experience).

## 3. Sufficiency of the Evidence

[33] Robinson argues the State failed to provide sufficient evidence to sustain his three convictions for armed robbery. He specifically claims the State failed to demonstrate he participated in the robberies.

[34] When an appellant challenges the sufficiency of the evidence to sustain a conviction, we look to the evidence and the reasonable inferences therefrom which supports the verdict. *Parsley v. State*, 557 N.E.2d 1331 (Ind. 1990). The identity of the perpetrator of a crime is a question of fact, not law, and the weight given to identification evidence is a function of the trier of fact. *Watkins v. State*, 551 N.E.2d 1145 (Ind. 1990). If there is evidence of probative value from which a reasonable trier of fact could infer that appellant was guilty beyond a reasonable doubt, then the conviction must be affirmed. *Parsley*, 557 N.E.2d 1331.

[35] To obtain three convictions of armed robbery as charged, the State was required to prove beyond a reasonable doubt that: (1) Robinson (2) knowingly (3) took property (money or clothing) (4) of another person (Wortinger, Holley, and Heitzman, respectively) (5) by putting the person in fear (6) while armed with a deadly weapon (a gun). Ind. Code § 35-42-5-1.

[36] One of the gunmen who participated in the store robbery wore blue latex gloves and had placed a bandana on his face. That man worked with the suspect in the hooded jacket, who emptied the cash registers. Meanwhile, the man in the bandana ordered Holley and Heitzman to disrobe. He took Heitzman's purse, and when the robbers fled from the store through the back door, he also took Holley and Heitzman's clothes.

[37] When the police searched behind the store, they found Holley's boot near a set of blue latex gloves. The gloves were submitted for DNA testing, and a DNA profile generated from one of the gloves matched Robinson's DNA profile. During questioning by a detective, Robinson denied that he had ever been to that store. This is sufficient evidence to establish that Robinson participated in the store robbery. *See Curtis v. State*, 42 N.E.3d 529 (Ind. Ct. App. 2015) (evidence sufficient to sustain conviction for armed robbery; Curtis had discarded a plastic bottle before entering the store, and his DNA was later discovered on the bottle), *trans. denied*.

[38] Robinson notes that none of the three women identified him or anyone else as a participant in the robberies. This is a request to reweigh the evidence, which our standard of review forbids. We affirm the trial court on this issue.

## 4. Appropriateness of Sentence

[39] Robinson argues his sentence is inappropriately high and asks the Court to order two or all three of his sentences to be served concurrently rather than consecutively. Article 7, section 6 of the Indiana Constitution authorizes this

Court to "review and revis[e]" sentences.  This constitutional authority is implemented through Indiana Appellate Rule 7(B), which provides:  "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

[40]     The principal role of appellate review under Rule 7(B) is to attempt to leaven the outliers, not to achieve a perceived correct result in each case.  *Threatt v. State*, 105 N.E.3d 199 (Ind. Ct. App. 2018), *trans. denied*.  As a result, the question is not whether another sentence is more appropriate, but whether the sentence imposed is inappropriate.  *King v. State*, 894 N.E.2d 265 (Ind. Ct. App. 2008).  "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case."  *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).  Robinson has the burden of proving his sentence is inappropriate.  *Estrada v. State*, 969 N.E.2d 1032 (Ind. Ct. App. 2012), *trans. denied*.

[41]     At the time Robinson committed his three offenses, the maximum sentence for a Level 3 felony was sixteen years, the minimum sentence was three years, and the advisory sentence was nine years.  Ind. Code § 35-50-2-5 (2014).  The trial court sentenced Robinson to sixteen years on each conviction, with three years suspended to probation for Count I.  The court further ordered Robinson to serve the three sentences consecutively, for an aggregate sentence of forty-eight years, with three suspended to probation.

[42]     Starting with the nature of the offenses, Robinson notes his aggregate executed sentence is close to the maximum and claims there "was nothing particularly heinous about the offenses." Appellant's Br. p. 21. We disagree. Robinson and his accomplices attempted to conceal their identities and appeared to have advance knowledge of the store's layout and security, which indicates a degree of planning.

[43]     Although use of a deadly weapon is an element of the offenses here, Robinson and his accomplices chose to use the handguns by pointing them directly at the three women. Further, when Wortinger claimed she did not know how to deactivate the back door alarm, Robinson and his companion pointed their guns at her head. His actions placed all three women in greater danger and terror than the elements of the offense required.

[44]     In addition, Robinson committed robbery against Holley and Heitzman by ordering them to disrobe at gunpoint and then stealing their clothes and Heitzman's purse. This act terrified and humiliated them, and he presumably gained very little from taking their clothes.

[45]     Finally, the robberies had long-term negative effects on Holley and Heitzman. Holley stopped working at night, and she is still fearful every time a man enters the store. Heitzman did not return to that store for four months. Nothing about the nature of the robberies merits a downward sentencing adjustment.

[46]     Turning to the character of the offender, Robinson was thirty-nine years old at sentencing. His criminal history includes convictions of dealing in cocaine or a

narcotic drug, robbery, battery resulting in bodily injury, two counts of resisting law enforcement, being a felon in possession of a handgun, operating a vehicle without ever receiving a license, and operating a vehicle without ever receiving a license with a prior conviction. It is troubling that Robinson continues to commit robberies and gun-related offenses. In addition, he was serving a sentence in community corrections when he committed the offenses at issue in this case. The State further alleged during sentencing that Robinson has a child support arrearage dating back to 2015, and Robinson's employment history is spotty at best. Robinson has failed to demonstrate that a reduction of his forty-eight-year sentence is appropriate in light of his character.

[47] For the reasons stated above, we affirm the judgment of the trial court.

[48] Judgment affirmed.

May, J., and Mathias, J., concur.