**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana



FILED

Sep 28 2012, 9:36 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MATTHEW THIES, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 15A01-1111-CR-553 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause No. 15C01-1012-FA-9

**September 28, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

<u>STATEMENT OF THE CASE</u>

Matthew Thies appeals his convictions, following a jury trial, for three counts of class A felony child molesting[1] and two counts of class C felony child molesting.[2]

We affirm.

<u>ISSUES</u>

1.      Whether the trial court abused its discretion by denying Thies's motion to strike a juror for cause during voir dire.

2.      Whether the trial court abused its discretion by excluding certain evidence.

<u>FACTS</u>

In February 2010, Thies and his then four-year-old son, M.T., moved in with his girlfriend, S.T. ("Mother"). Mother had two children: then nine-year-old daughter, C.T., and then six-year-old son, C.S.

In March 2010, C.T., who was in the fourth grade, told her school counselor, Angela Schmarr, that Thies "was spanking [her and her brother] really hard with a belt" and that he was leaving bruises. (Tr. 715). Child Protective Services ("CPS") went to C.T.'s house, and she told them that Thies had spanked her with a belt. CPS did not check C.T. for bruises and did not return to the house.

---

[1] Ind. Code § 35-42-4-3(a)(1).

[2] I.C. § 35-42-4-3(b).

In the Summer of 2010, then nine-year-old, C.T. started to have "bleeding from her privates" despite the fact that she showed no signs of entering puberty, such as breast development or growth of pubic hair. (Tr. 641). After contacting a doctor about the situation, Mother thought that hormones contained in food may have caused C.T. to start menstruating early. C.T. had recurrent bleeding during that Summer and Fall, and on those various occasions, C.T. showed Mother that her underwear had blood on it and that her "privates" were "swelled [sic] and raw and sore[.]" (Tr. 642).

In early November 2010, C.T.'s aunt, J.P. ("Aunt"), who babysat for C.T. while Mother and Thies were at work, saw Thies lying on the floor with then ten-year-old C.T., who was rubbing his arm. A few weeks later, Aunt saw Thies lying in his bed with C.T., who was rubbing his chest.

In early December 2010, C.T. told her friends, Z.M. and L.B., that Thies "was doing bad things to her[,]" (Tr. 834, 835), "like trying to get her into bed." (Tr. 841). C.T. also told them that "[s]he got raped." (Tr. 1027). Z.M. told C.T. that she needed to "tell a trusted soul like her mom . . . [or] Mrs. Schmarr[.]" (Tr. 837).

On December 7, 2010, C.T. told school counselor Schmarr that Thies "had been touching her in [her] private parts, and that he also had her suck his private part" while "her clothes were off." (Tr. 296). C.T. told Schmarr that Thies started doing these things in the summer after he moved in with them. After Schmarr reported the allegations to CPS, Detective Joseph Vance from the Dearborn County Sheriff's Department started an investigation into the allegations.

3

On December 8, 2010, Stephanie Black of the Child Advocacy Center conducted a videotaped interview with C.T. During the interview, C.T. told Black that Thies had made her suck his "private area," which he referred to as his "dick"; that he had touched her in inappropriate places, specifically on her "private parts" or vaginal area with his private area; that he had touched her private area with his finger; that he had made her touch and rub his private area; and that he had kissed or licked her vaginal area. (State's Ex. 32). C.T. stated that Thies had done these things multiples times and that it started after Thies moved in with them.

C.T. explained that the first time he touched her inappropriately was on a Saturday in the summer when Mother was at work. C.T. recounted in detail how Thies made her go to his bedroom, take off her clothes, and get in bed with him. In her own terms, she explained how he forced her to have sexual intercourse and how he forced her to perform oral sex on him. She described Thies's breathing and how "wet stuff" that tasted "weird" and "nasty" would come out of the top of his penis when he said what she was doing felt good. (State's Ex. 32).

C.T. explained that he molested her on Fridays, Saturdays, Mondays, and Tuesdays, which was when Mother worked. C.T. explained that the molestations usually occurred in Thies's bedroom but that he had also molested her in her bedroom, the laundry room, and the bathroom. C.T. was able to describe the physical appearance of Thies's penis and how it felt. She also recounted how Thies sometimes made her stay in his bedroom and rub his back while he played video games or would have her "pop" his back by standing on it.

4

Additionally, C.T. described the details of the last time that Thies molested her, which happened two days prior to her interview and the day before she reported the molestations to school counselor Schmarr. C.T. recounted that Thies went into her bedroom, woke her up, and made her suck on his "private area." (State's Ex. 32). She explained that his "wet stuff" went in her mouth and that a "little bit" had gotten on her bed. (State's Ex. 32). She stated that she wiped it off with some wet toilet paper, which she threw away in a downstairs trash can when she got a drink. C.T. stated that she wanted Thies to move out so he would stop doing these things to her.

After the interview, Detective Vance talked with Mother and arranged for the police to go to the house to collect some physical evidence. Thereafter, Detective Vance and Sheriff's Department crime scene investigator Detective Ed Lewis went to C.T.'s house and collected C.T.'s sheets, pillows, and blankets, a water bottle, a towel, and some toilet paper. Some of these items were later tested by the Indiana State Police laboratory. The toilet paper tested "presumptively positive for seminal material" and negative for a sperm search,[3] (Tr. 484), and DNA testing on it revealed that it "matche[d] the DNA profile" of Thies. (State's Ex. 42 at 2). Additionally, DNA testing of C.T.'s pillow case revealed that it contained a DNA mixture from which Thies could not be excluded.

Also, on December 8, 2010, Detective Vance interviewed Thies, who repeatedly denied the allegations against him. After this interview, Detective Vance went back to the house and collected additional evidence, including pornographic DVDs and a pornographic

---

[3] The forensic serologist testified that there is not always sperm in seminal material.

5

magazine belonging to Thies.

On December 9, 2010, C.T. was examined at Cincinnati Children's Hospital. The physical examination of C.T. revealed no tears or injury to her hymen. It also revealed that C.T. had not yet entered puberty. The examining nurse collected evidence for a sexual assault kit, and C.T.'s oral, vaginal, and anal swabs later tested presumptively positive for seminal material and negative for a sperm search. No male DNA was detected in DNA testing of the assault kit.

On December 10, 2010, Detective Vance and Detective Garland Bridges individually interviewed Thies. During the interviews, Thies initially denied any sort of sexual contact between himself and C.T. Later in the interviews, Thies admitted that, on December 6, C.T. had touched the base of his penis when she was lying in bed with him, but he claimed that he told her to stop. Thies told the detectives that he had a nightly ritual where he would lie in C.T.'s bed with her or she would lie in his bed with him with the door shut. Thies also informed the detectives that C.T. would push her pelvic area against him or push her buttocks into his crotch area. Thies told Detective Vance that C.T. would walk on his back to "pop" it and would sit on his buttocks and rub his back, and he told Detective Bridges that C.T. said she had a sexual fantasy about him. (Tr. 599).

On December 22, 2010, the State charged Thies with seventeen counts of child molesting, which included eleven class A felony counts and six class C felony counts. The State subsequently amended the charging information on the day of trial and proceeded on three counts of class A felony child molesting and two counts of class C felony child

6

molesting.[4]

The trial court held a seven-day jury trial in June 2011. Prior to the submission of evidence, the trial court granted the State's request for a motion in limine prohibiting the introduction into evidence of: (1) an allegation that Thies had abused another child; (2) a book titled How to Make Love Like a Porn Star; and (3) an unsubstantiated CPS report regarding an allegation that Thies had spanked C.T.

During voir dire, one of the prospective jurors, K.M., informed the prosecutor that he recognized the name of one of the scheduled witnesses, Ed Lewis, who was a detective with the Dearborn County Sheriff's Department and had previously worked for the Indiana State Police. K.M. stated that he currently worked for Honda, but that he had previously worked for the Indiana State Police for seven years in the commercial vehicle enforcement division and that he "kn[e]w Ed Lewis from that acquaintance." (Tr. 204). When questioned by the prosecutor, K.M. affirmed that his previous work in law enforcement would not affect his ability to be fair and impartial. Thies's attorney challenged "for cause" the seating of K.M. as a juror based on the facts that K.M. "was a State Police Officer and he also kn[e]w Ed Lewis[,] one of the witnesses in this case." (Tr. 206). The trial court denied Thies's challenge, and K.M. was placed on the jury.

At trial, Thies's defense was that C.T. made up the allegations of child molest against Thies because she was upset that Thies was disciplining her and because they had had a fight

---

[4] One of the class A felony counts was based on sexual intercourse, while the other two class A felony counts were based on deviate sexual conduct. The class C felony counts were based on fondling or touching.

7

about whether she would get a cell phone for Christmas. During opening statements, Thies's attorney asserted that this case was all about credibility and would be based on C.T.'s word against Thies's word. Also during opening statements, Thies's attorney started to make a reference to the book How to Make Love Like a Porn Star, and the prosecutor asked for a bench conference, during which the trial court reminded Thies's attorney of the motion in limine prohibiting any reference to this book.[5]

Dr. Robert Shapiro, the medical director from Cincinnati Children's Hospital, testified that C.T.'s physical examination revealed that she had not yet entered puberty. He further testified that if a ten-year-old girl had not entered puberty but had genital bleeding, it would indicate that the bleeding was caused by trauma to her genitalia. Dr. Shapiro testified that, from C.T.'s examination, he was unable to determine if sexual abuse had occurred. However, when asked for his opinion on the likelihood of sexual abuse given C.T.'s exam and history and the fact that C.T. had not had a period over the past six months since Thies had moved out, Dr. Shapiro opined that "she was likely sexually abused." (Tr. 448).

The State introduced into evidence the Indiana State Police Laboratory test results on the evidence collected that had been submitted for analysis. In addition, Mother testified that she saw that C.T. had vaginal bleeding and swelling during the Summer of 2010 despite the fact that C.T. had showed no signs of entering puberty. Mother further testified that since Thies moved out in December 2010, C.T. had not had any vaginal bleeding nor had she started her period.

[5] The majority of the bench conference was not transcribed because it was "INAUDIBLE." (Tr. 288).

During the trial, Thies made several offers of proof in an attempt to have the trial court reconsider some of the things that were ordered excluded by the pre-trial motions in limine. Specifically, Thies made an offer to prove to try to present evidence that the book How to Make Love Like a Porn Star was found in C.T.'s house; that C.T. had previously reported that Thies had spanked her and that CPS had filed a report that the spanking allegations were unsubstantiated; and that C.T. had made allegations that Thies had sexually abused his niece, Sk.T. The trial court denied Thies's requests to admit all of this evidence.

Thies testified in his own defense. During his testimony, Thies admitted that he had spanked C.T. and her brother and testified that he would threaten to use a belt on them. Thies also testified that, before C.T. had accused him of the molestations, he thought she had been having a sexual fantasy about him. He further testified that, prior to the molestation allegations, C.T. had rubbed her pelvic area on his leg when she hugged him. Thies testified that, despite these actions, he had lain in bed with C.T. in the evenings because he "was trying to fix the problems that she had" and because he wanted to be "a father figure[.]" (Tr. 984). Additionally, Thies admitted that C.T. had touched his penis on December 6, 2010, but he denied that he had molested C.T. in any manner.

The jury found Thies guilty as charged. The trial court sentenced Thies to an aggregate sentence of forty (40) years, with thirty (30) years executed and ten (10) years suspended to probation. Specifically, the trial court sentenced Thies to concurrent terms of forty years with ten years suspended for each of his class A felony convictions and eight years for each of his class C felony convictions. Thies now appeals his convictions.

9

Additional facts will be provided as necessary.

<center>DECISION</center>

1. <u>Challenge to Juror</u>

Thies argues that the trial court abused its discretion by denying his challenge for cause of K.M.'s placement on the jury.

It is well settled that a fair trial before an impartial jury is a fundamental right of our criminal justice system. *Whiting v. State*, 969 N.E.2d 24, 28 (Ind. 2012). To be impartial, "[j]urors need not be totally ignorant of the facts or issues involved in a case; rather, a constitutionally impartial juror is one who is able and willing to lay aside his or her prior knowledge and opinions, follow the law as instructed by the trial judge, and render a verdict based solely on the evidence presented in court." *Id.*

Challenges for cause are the primary way in which biased jurors are excluded from jury selection. *Id.* at 29. Indiana Jury Rule 17 does not impose any limits on the number of challenges for cause, "but each 'must be supported by specified causes or reasons that demonstrate that, as a matter of law, the [juror] is not qualified to serve.'" *Id.* (quoting *Gray v. Mississippi*, 481 U.S. 648, 652 n. 3, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987)). A decision whether to grant or deny a challenge for cause rests within the sound discretion of the trial court, and we will reverse the trial court only where the decision is "illogical or arbitrary." *Whiting*, 969 N.E.2d at 29. "We afford substantial deference to trial judges regarding this decision because they see the jurors firsthand and are in a much better position to assess a juror's ability to serve without bias and reach a decision based on the law." *Lindsey v. State*,

<center>10</center>

916 N.E.2d 230, 236 (Ind. Ct. App. 2009) (citing *Fox v. State*, 717 N.E.2d 957, 961 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*), *trans. denied*.

We initially note that Thies has not provided this Court with a full transcript of voir dire because only a "partial transcript of voir dire of prospective juror, [K.M.] [was] requested[.]" (Tr. 203) (capitalization removed). This limited record reveals that during voir dire, the following exchange occurred between K.M. and the prosecutor:

| [Prosecutor]: | Do you have any question, comments or concerns? |
|---|---|
| [K.M.]: | -INAUDIBLE- witness list I believe Ed Lewis he worked for the Indiana State Police. |
| [Prosecutor]: | That's correct. |
| [K.M.]: | I myself had seven years with the Indiana State Police –INAUDIBLE- . . . |
| [Prosecutor]: | Uh-huh. |
| [K.M.]: | . . . I know Ed Lewis from that acquaintance. |
| [Prosecutor]: | Okay. |
| [K.M.]: | I also know some of the State Police Officers from – INAUDIBLE-. |
| [Prosecutor]: | Is there anything about that that would affect your ability to be fair and impartial? |
| [K.M.]: | No. |
| [Prosecutor]: | Having known police officers you know that they can make mistakes as well as the next person, and if they were to testify you would judge their credibility the same way you would judge anyone else? |
| [K.M.]: | Absolutely. |

11

| | |
|---|---|
| [Prosecutor]: | Okay. And, you understand as we sit here today the defendant is presumed innocent. |
| [K.M.]: | Exactly. |
| [Prosecutor]: | And, the State must prove beyond a reasonable doubt that the defendant committed the crimes charged. |
| [K.M.]: | Absolutely. |
| [Prosecutor]: | Do you have any problem at all holding the State to that burden? |
| [K.M.]: | No. |
| [Prosecutor]: | And, is there anything about your previous role in law enforcement that would affect your ability to be a fair and impartial juror here today? |
| [K.M.]: | No. |
| [Prosecutor]: | And, were you part of the Indiana State Police Commercial Vehicle Enforcement Division? |
| [K.M.]: | Yes. |

\* \* \* \* \*

| | |
|---|---|
| [Prosecutor]: | And, you're now employed at Honda? |
| [K.M.]: | That's correct. |

(Tr. 203-05).

Thies's attorney then questioned K.M., establishing that, after K.M. worked for the State Police for seven years, he then worked as security for an insurance company in Ohio, followed by employment with Honda, where he had worked for the past three years. After Thies's counsel informed the trial court that she had no further questions, the trial court

12

requested counsel to approach the bench, where the following exchange occurred:

> COURT:    . . . This is a conference at the bench. -INAUDIBLE- either side has any peremptories left . . .
>
> [Prosecutor]: She's holding a paper up to pretend.
>
> COURT:    I understand.

(Tr. 206). Thereafter, Thies's attorney "move[d] for cause challenge" of K.M. based on his prior employment with the State Police and his knowledge of witness Ed Lewis. (Tr. 206). The trial court, noting that K.M. no longer worked as a law enforcement officer and that he had worked in the State Police's motor carrier division and not as an investigator, denied Thies's challenge for cause. Specifically, the trial court stated:

> Counsel, your objections are noted; however, I just don't think there's been a sufficient basis . . . I don't think those circumstances in and of themselves rise to the level of a cause challenge, I think that, again, he's indicated . . . and I take the juror at his word, that this would not create an issue for him. Again his association –INAUDIBLE- and not as an investigator with the Indiana State Police, he's with the motor carrier division, but that again, it's not now, that was in the past. I just don't see a sufficient basis for me to grant the challenge at this time. That being the case, I'm assuming since we have no peremptory challenges by the parties, that we have selected the jury.

(Tr. 207).

Thies contends that the trial court erred by denying his for-cause challenge of K.M. because the "trial court's decision to seat a juror with a prior police background is illogical." Thies's Br. at 16. He argues that "K.M.'s police experience and relationship with one of the witnesses drew into question how unbiased he could really be in this very serious criminal case" and that "[i]t makes no sense to risk bias by seating a former cop in a case with

13

multiple A Felony counts, uncertain physical evidence, and credibility issues." Thies's Br. at 16.

As a procedural matter, the State asserts that this Court need not address the merits of Thies's argument because Thies has not shown compliance with the exhaustion rule. Specifically, the State argues that "[b]ecause Thies has not met his burden of showing compliance with the peremptory challenge exhaustion rule, his claim that the trial court erred in denying his for-cause challenge to K.M. is waived for appellate review." State's Br. at 14.

The Indiana Supreme Court has explained that "[a]n appellate court will review a trial court's denial of a challenge for cause *only* if the defendant complies with the exhaustion rule." *Whiting*, 969 N.E.2d at 30. "To preserve for appeal a claim that the trial judge erred in denying a challenge for cause, the defendant *must* demonstrate that he or she either used a peremptory challenge to remove the challenged juror or had already exhausted his or her allotment of peremptories." *Id.* at 29-30. *See also Merritt v. Evansville-Vanderburgh Sch. Corp.*, 765 N.E.2d 1232, 1235 (Ind. 2002) ("'We have consistently held that to preserve any error the defendant bears the burden of demonstrating that *at the time* []*he challenged the jurors for cause,* []he had exhausted [his] peremptory challenges.'") (quoting *Robinson v. State*, 453 N.E.2d 280, 282 (Ind. 1983) (emphasis in original)). "Eventual use of all peremptory challenges is therefore not enough to satisfy the exhaustion requirement." *Merritt*, 765 N.E.2d at 1235. Our Supreme Court explained that the rationale for the exhaustion rule is as follows: "'[W]here a trial court may have erred in denying a party's challenge for cause, and the party can cure such error by peremptorily removing the

14

apparently biased venireperson, the party should do so in order to ensure a fair trial and an efficient resolution of the case.'" *Id.* (quoting *Merritt v. Evansville-Vanderburgh Sch. Corp.*, 735 N.E.2d 269, 272 (Ind. Ct. App. 2000) (Sharpnack, C.J., dissenting), *trans. granted*).

The State contends that "Thies has not shown compliance with the exhaustion rule because the record supports the inference that he had peremptory challenges left when the trial court denied his for-cause challenge to K.M." State's Br. at 13. The State further argues that the trial court's statement—"I'm assuming since we have no peremptory challenges by the parties, that we have selected the jury"—(tr. 207), "implies that the parties had peremptory challenges left but chose not to use them." State's Br. at 13. The State further asserts that Thies's failure to provide a record showing that he had no peremptory challenges remaining at the time of his for-cause challenge results in waiver of the issue on appeal.

In his reply brief, Thies admits that "the transcription leaves much to be desired given the number of 'inaudibles' found in place of actual courtroom discussion[,]" Reply Br. at 4, but contends that the transcript is sufficient for us to review the merits of his argument because "it adequately shows this Court that Thies had exhausted his challenges and was left to argue exclusion of juror K.M. for cause." Reply Br. at 5. Thies suggests that the prosecutor's reference to defense counsel "holding up a paper to pretend[,]" (tr. at 206), "clarifie[s]" that defense counsel was "pretend[ing] to the jury that she had [peremptory] challenges left[.]" Reply Br. at 5. In regard to the trial court's comment that "we have no peremptory challenges by the parties[,]" (tr. at 207), Thies contends that a "more plausible interpretation given the prior discussion about Thies's counsel pretending to have challenges

15

left when she did not, is that neither Thies or the State had any peremptories remaining." Reply Br. at 5.

Instead of this Court trying to deduce from the limited record presented that Thies had actually complied with the exhaustion rule, Thies could have either provided the entire voir dire transcript, which would have revealed any peremptory challenges used, or prepared a verified statement of the evidence pursuant to Indiana Appellate Rule 31[6] to reconstruct the inaudible portions of the transcript that may have provided more clarity regarding the existence of any remaining peremptory challenges. Indeed, Thies has the "burden 'to present a record that is complete with respect to the issues raised on appeal, and this burden includes a duty to ensure that the court has a transcript of the appropriate trial proceedings.'" *Perez–Grahovac v. State*, 894 N.E.2d 578, 585 (Ind. Ct. App. 2008) (quoting *Reid v. State*, 719 N.E.2d 451, 457 (Ind. Ct. App. 1999), *reh'g denied*, *cert. denied*), *reh'g denied, trans. denied*. *See also Reed v. State*, 702 N.E.2d 685, 689 (Ind. 1998). Because the limited record before us suggests that the parties had peremptory challenges remaining, Thies has failed to show that he complied with the exhaustion rule and has waived review of his claim that the trial court erred by not removing K.M. for cause. *See Whiting*, 969 N.E.2d at 30.

---

[6] Indiana Appellate Rule 31(A) provides:

> If no Transcript of all or part of the evidence is available, a party or the party's attorney may prepare a verified statement of the evidence from the best available sources, which may include the party's or the attorney's recollection. The party shall then file a motion to certify the statement of evidence with the trial court or Administrative Agency. The statement of evidence shall be attached to the motion.

16

Waiver notwithstanding, Thies has not shown that the trial court abused its discretion by denying his for-cause challenge of K.M. Challenges for cause "must be supported by specified causes or reasons that demonstrate that, as a matter of law, the venire member is not qualified to serve." *Whiting*, 969 N.E.2d at 29. Thies suggests that K.M. was biased in favor of the State based on his prior employment with the Indiana State Police and his familiarity with a witness. "Juror bias may be actual or implied, based upon a finding that a certain relationship exists." *McCants v. State*, 686 N.E.2d 1281, 1284 (Ind. 1997). "The trial court must weigh the nature and extent of the relationship versus the ability of the juror to remain impartial." *Id.* at 1284-85.

During voir dire, potential juror K.M. immediately disclosed that he knew a listed witness based upon his prior employment with the Indiana State Police. (Tr. 204). K.M., however, provided assurance that he would be fair and impartial and would have no problem holding the State to the burden of proving beyond a reasonable doubt that Thies had committed the crimes charged. Thies challenged the seating of K.M. as a juror, and the trial judge denied Thies's challenge, noting that he took K.M. at his word that he could render an impartial verdict and finding that Thies had failed to provide a sufficient basis to grant his challenge. The trial judge was in a much better position to assess K.M.'s ability to serve without bias and reach a decision based on the law. *See Fox*, 717 N.E.2d at 961-62. Because the trial court's decision to deny Thies's challenge was not illogical or arbitrary, we conclude that the trial court did not abuse its discretion by denying Thies's challenge to juror K.M. *See, e.g.*, *McCants*, 686 N.E.2d at 1285 ("timely disclosure of a juror's casual relationship

17

with a witness or party, coupled with an assertion that the juror will remain impartial, adequately protect a defendant's right to an impartial jury"); *Fox*, 717 N.E.2d at 962 (affirming the trial court's denial of challenge to juror who knew an individual on the witness list but stated he would do his "very" best to render a fair and impartial verdict).

2.      Exclusion of Evidence

Thies contends that the trial court abused its discretion by excluding the following evidence: (a) testimony that C.T.'s allegation that Thies had spanked her with a belt was unsubstantiated by CPS; (b) testimony that the book How to Make Love Like a Porn Star was found in C.T.'s house; and (c) testimony that C.T. had alleged that Thies had molested Sk.T. and that Sk.T. denied being molested.[7]

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). To reverse a trial court's decision to exclude evidence, there must have been error by the court that affected the defendant's substantial rights and the defendant must have made an offer of proof or the evidence must have been clear from the context. *Stroud v. State*, 809 N.E.2d 274, 283 (Ind. 2004). "The purpose of an offer to prove

---

[7] Thies contends that the trial court's exclusion of these three aspects of testimony from evidence deprived him of his constitutional right to present a defense. Thies, however, has failed to show where in the transcript he argued for the admissibility of any of this testimony based on this ground at trial. "'A defendant may not object on one ground at trial and raise another on appeal; any such claim is waived.'" *Saunders v. State*, 848 N.E.2d 1117, 1122 (Ind. Ct. App. 2006) (quoting *Burks v. State*, 838 N.E.2d 510, 522 (Ind. Ct. App. 2005), *trans. denied*), *trans. denied*. Because Thies did not assert this constitutional argument at trial, he has waived it on appeal. *See, e.g.*, Saunders, 848 N.E.2d at 1122 (holding that the defendant waived his argument that excluded evidence violated his constitutional right to confront witnesses by failing to make that argument at trial).

18

is to enable the trial court and this court to determine the admissibility and relevance of the proffered evidence." *Carter v. State*, 932 N.E.2d 1284, 1287 (Ind. Ct. App. 2010). "The failure to make an offer to prove results in a waiver of the asserted evidentiary error." *Id.*

A. *Spanking*

Thies first contends that the trial court abused its discretion by excluding evidence that CPS had determined that C.T.'s allegation that Thies spanked her with a belt was unsubstantiated.

Prior to trial, the trial court granted the State's motion in limine to exclude any evidence regarding a "comment or claim that [C.T.] made a prior report alleging 'Spanking' abuse by [Thies]." (App. 226). At the beginning of the trial, after C.T.'s school counselor had testified, Thies made an offer to prove regarding the spanking incident. Specifically, during this offer to prove, Thies's attorney questioned school counselor Schmarr regarding C.T.'s allegations that Thies had spanked her. Schmarr testified that C.T., upon the advice of her mentor, came to talk to Schmarr in March 2010 and told Schmarr that "she had gotten a whipping" and that Thies had "whip[ped] her and her brother maybe with a belt." (Tr. 307). When Thies's attorney asked Schmarr whether C.T. had reported that Thies had left bruises when he had spanked C.T., Schmarr responded, "I don't recall that." (Tr. 307). Schmarr testified that, upon receiving this information from C.T., she contacted CPS, but she did not recall if she received any response back from them after they had investigated and that she did not know whether CPS had substantiated or unsubstantiated the claim.

When arguing that the trial court should allow Thies to present evidence regarding the

19

spanking incident, Thies's attorney stated:

> Judge, the reason we're asking you to reconsider granting the Motion in Limine is because CPS issued a report unsubstantiated the allegations of child abuse specifically spanking that would leave bruises, and we believe and contend that this is an allegation that [C.T.] simply made up and fabricated and it was one of her first attempts to get either her mother or someone to remove Matthew Thies from the house. It clearly goes to the part of her credibility, and Judge, for that basis we ask you to reconsider.

(Tr. 308-09). The trial court denied Thies's request to introduce evidence regarding the spanking, noting that there was a lack of any proffered evidence regarding bruising and that "there ha[d] been nothing presented to the Court to allow the Court to make a finding that the statement which is alleged is demonstrably false." (Tr. 310).

Prior to the testimony of C.T., Thies asked the trial court to reconsider the ruling, and the trial court again denied the request. Later in the trial, during C.T.'s testimony, her videotaped interview with Child Advocacy Center was admitted into evidence and played for the jury. In that video, C.T. mentioned that she had talked to CPS about Thies spanking her and leaving bruises. During a break in C.T.'s testimony, Thies again asked the trial court to reconsider the motion in limine excluding evidence that the spanking incident was unsubstantiated by CPS, arguing that C.T.'s videotaped testimony opened the door to evidence regarding the spanking incident.

The State informed the trial court that it had no objection and agreed the door had been opened into questions regarding the spanking allegations; however, the State argued that there should be no evidence admitted that the spanking allegations were unsubstantiated,

20

just as there would be no evidence admitted that the molestation allegations had been substantiated.

The trial court ruled that Thies could ask C.T. about the spanking allegation and the fact that she spoke to someone about it but instructed Thies that he could not ask C.T. any questions about whether the allegation was substantiated. The trial court stated that it would deal with the admission of evidence regarding the spanking being substantiated "on a witness by witness issue by issue basis." (Tr. 712).

Thereafter, Thies cross-examined C.T. about the spanking allegations that she had made to school counselor Schmarr. Specifically, C.T. testified that she told Schmarr that Thies had spanked her really hard with a belt and left bruises, that CPS came to her house to talk to her but did not check her for bruises, and that CPS did not come back again. During Thies's case-in-chief, his attorney questioned Mother and Aunt about the spanking incident. Aunt testified that she knew that C.T. had accused Thies of spanking her and leaving bruises but testified that she had not seen any bruises on C.T. In response to Thies's counsel's question about whether some "folks" came to her house to talk to C.T. about her report to her school counselor that Thies had spanked her and left bruises, Mother agreed that they had and further testified that she was not told to seek counseling for C.T. based on those allegations. (Tr. 915). Finally, during Thies's testimony, he admitted that he had spanked C.T. and her brother and testified that he would threaten to use a belt on them.

Before addressing Thies's arguments, we must first determine whether Thies has preserved this issue for appeal by determining whether (1) Thies made a proper offer to prove

21

at trial and (2) whether the offer to prove covers the same grounds or arguments that Thies raises on appeal. *See Roach v. State*, 695 N.E.2d 934, 939 (Ind. 1998), *reh'g granted on other grounds*. As to the first determination, an offer of proof "must contain the following three elements: [1] it must make the substance of the excluded evidence or testimony clear to the court; [2] it must identify the grounds for admission of the testimony; [and] [3] it must identify the relevance of the testimony." *Arhelger v. State*, 714 N.E.2d 659, 666 (Ind. Ct. App. 1999) (citing *Roach*, 695 N.E.2d at 939).

Here, Thies's counsel made clear to the trial court the substance of the excluded testimony and argued that it was relevant to attack C.T.'s credibility, but his counsel did not specifically identify the grounds for the admission of the testimony. Thus, he did not make a proper offer to prove. *Arhelger*, 714 N.E.2d at 665 (finding defendant did not make a "valid offer of proof" where defendant did not "even touch upon the grounds for . . . admission" of the cross-examination testimony).

Furthermore, Thies's offer to prove at trial did not include the same grounds or arguments that he now raises before this Court. On appeal, Thies contends that the trial court's ruling excluding the evidence was erroneous because the evidence should have been admitted under Indiana Evidence Rules 404(b) and 616 and because the demonstrably false limitation cited to by the trial court applies only to prior false accusations of rape. Thies, however, did not raise any of these arguments to the trial court when making his offer to prove. As a result, Thies has waived review of these arguments on appeal. *See Saunders*, 848 N.E.2d at 1122 (explaining that waiver results when a defendant objects on one ground

22

at trial and raises another on appeal); *see also Roach*, 695 N.E.2d at 940 (holding that the defendant had waived appellate review of his argument that the trial court erred by excluding evidence where his grounds on appeal were not before the trial court).

Waiver notwithstanding, we conclude that the trial court did not abuse its discretion in excluding evidence regarding the spanking incident being unsubstantiated. Here, Thies attempted to attack C.T.'s credibility by introducing evidence of a specific instance of conduct regarding C.T.'s truthfulness. However, Indiana Evidence Rule 608(b) provides that "[f]or the purpose of attacking or supporting the witness's credibility, other than conviction of a crime as provided in Rule 609, specific instances may not be inquired into or proven by extrinsic evidence." Thus, the trial court did not abuse its discretion in excluding such evidence.[8]

B. *Book*

Next, Thies asserts that the trial court abused its discretion by excluding evidence that the book How to Make Love Like a Porn Star by porn star Jenna Jameson was in C.T.'s house.

---

[8] We do, however, acknowledge that Thies's contention—that the demonstrably false limitation cited to by the trial court applies only to prior false accusations of rape—is correct. In *State v. Walton*, our Indiana Supreme Court explained that Indiana Evidence Rule 608 "provides no exceptions for prior false accusations," but held that "evidence of prior false accusations of rape is admissible to attack the credibility of the accusing witness, notwithstanding the general exclusionary edict of Rule 608(b)." *State v. Walton*, 715 N.E.2d 824, 827 (Ind. 1999). The *Walton* Court explained that this common-law exception permitting the admission of evidence of prior false accusations of rape could be admitted into evidence only if: (1) the complaining witness admitted that she made a prior false accusation of rape; or (2) the accusation was demonstrably false. *Walton*, 715 N.E.2d at 828 (citing *Stewart v. State*, 531 N.E.2d 1146, 1149 (Ind. 1988)). This common-law exception, however, is "limited . . . to very narrow circumstances—specifically prior false accusations of rape—that do not apply here." *Saunders*, 848 N.E.2d at 1122.

23

The trial court granted the State's motion in limine, based on Indiana Rules of Evidence 401-404, to exclude any reference to the book. At trial, prior to C.T.'s testimony, Thies made an offer to prove, arguing that the book should be admitted into evidence because it was "relevant[.]" (Tr. 611). Thies's counsel argued that the book was relevant because there had been evidence that the police had collected pornographic DVDs and a pornographic magazine belonging to Thies. Thies's counsel also argued that it was relevant because it contained a passage where Jameson described being raped, which his counsel argued was similar to statements that C.T. made to her friends, L.B. and Z.M.

As part of his offer to prove, Thies did not offer the book; instead, he read the following passages: "If anyone tried to rob or rape you, you're suppose[d] to stay still and comply so that you don't get hurt" and "He laid down over me, pressing his chest against my face so that I couldn't scream." (Tr. 612). Thies played the taped interview of C.T.'s friend, L.B., who stated that C.T. told her that Thies did bad things to C.T., that he raped her, and that he put his hand over C.T.'s mouth so she would not scream. Thies also called Mother to provide testimony about the presence of the book in the house and whether C.T. had read it. Mother confirmed that the book was in her house for eight years. Mother also testified that C.T. had asked who the girl was on the cover of the book and had asked to read the book, but Mother stated that she told C.T. that she was not allowed to read it.

The State argued that the 600-page book did not contain anything that was similar to C.T.'s statements about the molestations and that, under the balancing test of Evidence Rule 403, it was misleading to suggest that C.T. got the idea of rape from the book.

24

The trial court first pointed out that Thies had initially introduced evidence of the pornographic DVDs and pornographic magazine during his cross-examination of Detective Vance. The trial court then denied Thies's request to admit the book into evidence, stating that it was "using a balancing test[.]" (Tr. 628). Specifically, the trial court stated that there had been no evidence "other th[a]n speculation" that C.T. had actually read or "reviewed" the book, (Tr. 628), and found that "the probative value, if any, would be outweighed by the possible prejudicial affect [sic]." (Tr. 629). The trial court ruled that the motion in limine regarding any reference to the book would "stand" but that the trial court could reconsider if matters changed as the trial proceeded. (Tr. 629).

Later, during a break in C.T.'s testimony, Thies asked the trial court to reconsider the motion in limine excluding the book, arguing that the passages of the book previously read into the record were relevant and probative. The trial court again denied Thies's request, citing to the "balancing test." (Tr. 709).

Thies argues that the trial court abused its discretion by excluding evidence that the book was in C.T.'s house. On appeal, Thies argues that this evidence was relevant to his defense theory and challenges the trial court's determination under Evidence Rule 403.[9]

Under Evidence Rule 403, a trial court may exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

---

[9] Thies makes arguments on appeal, including references to the "sexual innocence inference theory" and the Rape Shield Law, that he did not make at trial. Thies's Br. at 30. Because Thies did not raise these arguments to the trial court when making his offer to prove, he has waived review of these arguments on appeal. *See Roach*, 695 N.E.2d at 940.

25

or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." In applying the balancing test of Evidence Rule 403, the trial court has "wide latitude," and its determination is reviewed for an abuse of discretion. *Willingham v. State*, 794 N.E.2d 1110, 1116 (Ind. Ct. App. 2003).

Here, Thies sought to introduce evidence that a book about the life story of a porn star, which the record shows that C.T. did not read, was in C.T.'s house. Aside from the fact that Thies has not shown how evidence of the existence of a book not read by C.T. would be relevant to a determination of whether he molested her, he has also failed to show that the trial court's determination that the limited probative value of such evidence would be outweighed by the danger of unfair prejudice. Accordingly, we cannot say that the trial court abused its discretion by excluding such evidence.

C. *Allegations of Sexual Abuse of Another Child*

Finally, Thies argues that the trial court erred by denying his request to admit testimony from Sk.T. that: (1) C.T. had alleged that Thies had molested Sk.T.; and (2) Sk.T. denied being molested.

Prior to trial, the State filed a motion in limine seeking to exclude evidence of "[a]ny comment or claim that [C.T.] made a prior report alleging abuse of [Sk.T.] by Defendant, or any cross-examination of [C.T.] or questioning of any other witness concerning same." (App. 158-59). The State asserted in the motion in limine that C.T. had not made a specific allegation of abuse but had merely stated that Sk.T. had told C.T. that Sk.T. and Thies "had a secret" and that Thies could not show that this statement was demonstrably false. (App.

26

159). The trial court granted the State's motion in limine.

When cross-examining C.T., Thies's attorney asked her, "Do you remember telling anyone that [Thies] and [Sk.T.] had a secret?" (Tr. 725). The State objected, reminding counsel that this topic was the subject of a motion in limine. Thies's counsel stated that she wanted to question C.T. about the secret and what it was but admitted that she did not know what C.T.'s answer would be. Thies then made an offer to prove, during which the following exchange occurred:

[Thies's Attorney]: I believe the evidence will show that [C.T.] told someone . . . she thinks it might be the Child Advocacy lady and Jessica, that [Thies] . . .

COURT: Child Advocacy Lady . . .

[Thies's Attorney]: Stephanie Black. Stephanie Black and Jessica that . . .

COURT: Who's Jessica?

[Thies's Attorney]: A friend of her mother's. And, that she told them that [Thies] and [Sk.T.] had a secret, and the secret was that [Thies] was doing the same thing to [Sk.T.] . . . was molesting [Sk.T.] and her two younger sisters, and that he told them not to tell or that he would beat them up. That's the secret, and then she . . . [Sk.T.] was brought in, they did a video tape of [Sk.T.] and they asked her about that secret, [Sk.T.] knew what the secret was, but she had said . . . she said 'it's not true, it never happened,' so it's a false allegation.

COURT: What you're seeking to offer –INAUDIBLE– . . .

[Thies's Attorney]: No, I'm . . . what I'm seeking to admit here, is that she told a lie about [Thies] and [Sk.T.].

COURT: What you're seeking to admit here –INAUDIBLE– what you're offering is specific –INAUDIBLE–. Correct?

27

[Thies's Attorney]: Yes, and it's very relevant because it's another thing that she said that [Thies] had done.

COURT: –INAUDIBLE–

[Prosecutor]: Your Honor, there is no offer to prove, there's no witness that has said that the secret was a sexual allegation, there's nothing.

(Tr. 727-28). The trial court then sustained the State's objection.

After Thies testified at trial, his counsel made another offer to prove to try to present evidence that C.T. had made allegations that Thies had molested Sk.T. As part of Thies's offer to prove, Thies's counsel presented testimony from Sk.T. and her mother. Sk.T.'s mother testified that a CPS worker showed up at her house and informed her that there were allegations involving her three daughters, including Sk.T. Sk.T.'s mother further testified that the CPS worker told her that the allegation involved "a secret with three of [her] girls that [C.T.] said there was a secret with three of them that [Thies] had molested them." (Tr. 1007-08). She also testified that Sk.T. was taken to the Child Advocacy Center, where CPS conducted a video interview with her. Sk.T. testified that a CPS worker came to their house in December 2010 and that her mother told her that CPS was there because C.T. had said that Thies molested her and her two little sisters. During the offer to prove, when asked whether Thies had ever molested her, Sk.T. responded, "No." (Tr. 1013).

When Thies's counsel argued that the trial court should admit Sk.T.'s testimony, counsel did not refer to a specific rule of evidence regarding the admissibility of such testimony. Nevertheless, Thies argued that he wanted to "call [Sk.T.] to testify about this

28

allegation and whether or not it's true" and to "call her mother to talk about CPS coming to their house doing the investigation" and that he also wanted to admit the video tape of Sk.T. (Tr. 1013-14).

The State argued that Thies was merely relying on hearsay to assert that C.T. had made an allegation that Thies had molested Sk.T. and that Thies had failed to present specific evidence that C.T. had made such an allegation. The State also argued that Sk.T.'s statement that she had not been molested was not relevant to this case and requested that the trial court keep its prior ruling on the motion in limine in place.

The trial court denied Thies's request to admit evidence that C.T. had made allegations that Thies had molested Sk.T. (Tr. 1015, 1030). Specifically, the trial court stated:

> I'm finding that an insufficient basis has been presented to inject this separate matter into this case, I find that there's an insufficient nexus between the two events, and an insufficient presentation on the offer to prove for the Court to find that this is relevant, and to permit this testimony, and my . . . it appears to me that what it is based upon is under Rule 608 –INAUDIBLE– character and conduct of witness, and, again, for those reasons I will deny the request.

 (Tr. 1015-16).

While the record before us is not completely clear due to the inaudible portions that were not transcribed, it appears that Thies's ground for admissibility of the excluded evidence was based on Indiana Evidence Rule 608.[10] Thies, however, argues different grounds on appeal than he did in his offer to prove. Accordingly, he has waived review of

---

[10] To the extent that Thies argued a different ground for admission of the evidence, he fails to indicate what that ground was and where in the record it can be found.

this issue. *See Roach*, 695 N.E.2d at 940; *Saunders*, 848 N.E.2d at 1122.

Waiver notwithstanding, the trial court did not abuse its discretion in excluding evidence that C.T. had falsely accused him of molesting Sk.T. At trial, Thies specifically argued that he sought to admit this evidence to show that C.T. had "told a lie" about him. (Tr. 727). Thus, he was seeking to attack C.T.'s credibility by introducing evidence of a specific instance of conduct regarding C.T.'s truthfulness. However, Indiana Evidence Rule 608(b) precludes the introduction of evidence of specific instances of conduct for the purpose of attacking a witness's credibility. Thus, the trial court did not abuse its discretion in excluding such evidence.

### CONCLUSION

Thies has waived review of his arguments that the trial court abused its discretion by denying his for-cause challenge of a juror and by excluding certain evidence. Waivers notwithstanding, we conclude that there was no error in the trial court's rulings on the for-cause challenge or the exclusion of evidence.

Affirmed.

FRIEDLANDER, J., concurs.

BROWN, J., concurs in result without opinion.

30